Oral argument not to exceed 15 minutes per side. Mr. Stanley for the appellants. Your Honor, it's Jeff Stanley for plaintiff appellants, MedJets, and Columbia Insurance. I have requested three minutes, Your Honor. May it please the Court, when a trademark is used at the point of sale, it's one of the best uses of a trademark. When a trademark is used at the time of a sale, it's one of the best times to use a trademark. And I submit to this Court that the trademark IntelliJet was used by NetJets at the point of sale and at the time of sale. And it was done so on the tours that were conducted by our client of customers and potential customers who were touring the NetJets facility, interested in buying private aviation services. When they were taken on these tours, they were shown the trademark on the screen. They were told about the IntelliJet software. They were told about the benefits that the IntelliJet software provides to them. And as a result, I submit that it was used at the time of sale, at the point of sale. I'm trying to classify these by category. It appears that there are two core issues here. There's the registered marking connection with the software, and then there is the use of this connection to services, shall we say. So you're beginning with the services one, correct? Well, actually both, Your Honor. I believe both of them apply at that occasion that I'm talking about, those tours that they made. Because at that point during the tours, they're selling the NetJets aviation services. That would be the service aspect. They're also selling the benefits of that software for the customer. It's one of the differentiating points about what NetJets does compared to all their other customers. They're not selling the software as a good. It's a service. And Your Honor, I agree with you that it is sold as a service. I also think… Why did you register it as a good? Why did you register it as a service? I think at the time when it was registered as a good, it was done properly, Your Honor, because at that point in time, software was considered to be in Class 9 as a good. And I believe that was the intent of the attorney at the time it was filed. The good, if I may, Your Honor, has to do with – and this has been much debated in the briefs – but I do believe that the consumer of these NetJets services gets the benefit of the good. They certainly get the benefit of all the things that software can do for them. And our opponent seems to be suggesting that, like a bicycle, if you've purchased a bike, that unless you're in receipt of the bike, you have no use of the bike. And that's true when it comes to bicycles. But when it comes to software, we're in a different era. This is a different time. And software is so much different than the regular goods such as bicycles that are out there. Our clients benefit from – our customers, our clients benefit from the use of this software. But the analogy – that would make more sense if you had software and you said, oh, you're a client. So boom, download this into your computer. You now have it. And now whenever you are thinking of doing something with this, you use it. And then they have it. They have the code. They do everything with it. But that's not how this works. I mean, right? Or is there a fact to speak about that? I somewhat disagree with that, Your Honor, because I believe they do have use of it when they want use of it. And it was through the telephone. They would pick up the telephone. They would contact the NETJETS representative or agent at the NETJETS facility in Columbus. That NETJETS agent would talk to them and say, when do you want to leave? And they plug that in. What do you want served on the plane for food? What kind of movies do you want? All of that was entered over the telephone. And I'm saying that's use by proxy, Your Honor, of the software. What's your best case for this use by proxy doctrine? I believe it's new, Your Honor. I believe this situation is new and different. And our opponent would have us living in the dark ages before software. We are in software at this point in time. It's a software-based world. It's going to continue to change. My goodness has it changed over the last 15 to 20 years. When we used to get floppy disks, then it went to CD-ROM, then it went to thumb drives. Now it's software in the cloud. Where does it go next? And I ask this court. I get all the innovation points, but I just go back to the fine. But sometimes things remain entirely internal to the company. Customers don't have access to what all the engineers are doing before the plane takes off. You would never think of anything they're doing as something that, yes, the customer uses it. Yes, if the customer calls, they'll start doing things. And, yes, one hopes they'll do the right things. But you just would never think that the customer, is that either good or service, frankly, that the customers will use it. And that's why I take it back to the tours, Your Honor. The tours were the starting point of the relationship. This is where the customers and potential customers were shown what is going to be used for their benefit. They were told about it. You could have had a tour of the planes. I'm sorry? You could have had a tour of the planes. And they did. Check it out. I don't know about that. But that would be, is your argument really peculiar to software? If they say, okay, our planes now are super-duper baby bear airplanes because we've done such and such, is that the same kind of use by proxy? Would that be rigid, a protectable market? You're not giving them the plane. You're not selling them the plane. But eventually they're going to use the plane. I'm not entirely sure I understand your question, Your Honor. If you had some kind of specialized name and configuration for your plane, tell them that. Would that specialized name that you give the plane be equally protectable with IntelliJet? I believe so, Your Honor. So then it isn't a software issue, is it? This use by proxy doctrine isn't special to software? Well, in the sense that they – I guess what I'm hearing you say is about the use of the plane. They wouldn't have had a telephonic or any way of interacting with the plane, but they did. They used the plane when they got on it, right? They did when they got on it. That's correct. But they do. But they certainly did and still do interact with the software every day. And for most of the years, they did it telephonically. For more recent years, it's now accessible on the Internet. But they used the software. It was promoted to them. This software has been written about in various publications by third parties not related to NetJet and has been identified as being a software product that is recognized. So is that under the common law doctrine then as opposed to the registered form? I know you have several theories and several attacks here. Yes, with respect to – To sort them out. Certainly, Your Honor. So our position on the trademark registration is that there is this use in commerce, started on the tours, and is later conducted by proxy. Then moving on to the common law, our position is in the common law that potential customers were instructed about the IntelliJet software as a feature or benefit of flying with NetJets, of their private aviation services. And it is our view that those private aviation services were promoted in part through the IntelliJet trademark and the benefits of the IntelliJet software which were told to our customers. So I think from what you're saying, would you concede you never publicly marketed the software program other than through this via proxy or by business tours? Would you – there's nothing out there that's evidence where you're publicly marketing the software program. I believe that, Your Honor, in our brief, there's actually a picture of a newsletter by our president at the time who was promoting the IntelliJet software. To sell it as software or selling it as saying it's a benefit? What do you mean by that? He's selling the benefit of the software and what it can do for their customers. He was also selling it in association with the services of private aviation, promoting the private aviation services of NetJets with the use of the IntelliJet trademark. In that article – and that's just one example, Your Honor. If treating the software as a good, have you licensed or sold the software in such a way as to have sold it in commerce? I believe the answer is yes. We've come under some criticism from our opponent that those licenses that we granted – and there were a half a dozen, maybe something like that. They were, in most instances, with affiliated entities. There were a couple of instances where those licenses were granted, where they were not with affiliated entities. Marquis Jet took a license. They're now owned by NetJets, but at the time they took the license, Marquis Jet was not affiliated. There's also the international entity, NAS, I believe is their acronym. NAS took a license. They were part of an organization, NetJets of the Middle East, I believe. Technically, NAS was not an affiliate of NetJets. They also took a license. You might refer to them more, I guess, as a franchise. But nevertheless, it demonstrates the differences between our situation in this case and the Lens.com case. In the Lens.com case, that software was not recognized by the consumer, by the public, as the trademark being associated with that software. We have the opposite case. We have a situation where the tours actually pointed to the software, showed them the trademark, so it was most definitely associated with the software in the tours. Secondly, the software has independent value, as evidenced by those licenses we've talked about, as evidenced by the discussion that General Electric and the U.S. government have even expressed some interest in how well this works for NetJets, this software program. They've expressed some interest in either licensing or buying it. So I believe it does have independent value, and that's another difference. But it's fair to say you're not really in the business of marketing that, or you're not out there marketing this to non-affiliates, right? Fair to say, Your Honor. Yes, fair to say. We think it's a distinguishing aspect of our company. We don't want our competitors using it because we think it's a great benefit to us. We don't want to share that with a competitor. They're not using your software, though. They're using your name. Is that right? And this whole attack is about their using the name of the word IntelliJets. It's not that they're using your software. That is correct, Your Honor. That is correct. In this area, you know, it's always about passing off and all that stuff. So I'm trying to, at a pretty soaring level of generality, I guess probably in NetJets' case, what exactly is the harm? Is it just that one day this may be a great mark and we want to preserve it? So I'm really having a hard time seeing the immediate problem for you. Your Honor, I think it's the problem that every trademark owner faces it from some time or another when they find that someone's using the same trademark. They have to go through the analysis. Is there a use of that trademark in the same general industry? In this case, yes. Is there any way they would be persuaded to maybe stop using it? That was tried. It didn't work. I can't imagine a scenario in which you could lose any business from what's going on here. I can give you a scenario, Your Honor. Our opponent developed in-house, and apparently did not publicly circulate, but started referring to their program that they have as a flight program in a derogatory term. If that derogatory term were to go public, it could somehow have implications in this world in which we live in today to our name. That is one of the precise reasons why we have to be diligent in the pursuit of our trademarks is because if things like that hit the Internet today, they spread like wildfire, and suddenly a treasured mark of our company is tarnished. That sort of thing happens when you let other parties use your mark. They were in the field of charter. They were in the field of leasing aircraft. The Census said that they changed their business model a little bit. They're not doing all those things they were doing at the time we filed suit. But certainly at the time we filed suit, they claimed to be doing those things that we do. They're primarily an aircraft broker. It's not all that well known. We also sell aircraft. We have a huge fleet of aircraft. From time to time, those aircraft have to be sold. And so he's in competition with us in that regard, and that's why we felt it was close. Thank you. Thank you, Counselor. You're welcome. In police court, Joe Driver and Mary True for the defendant's telejet, which is a one-person, man-and-wife company based in Jacksonville, Florida, that sells nothing other than used aircraft. Mr. Stanley's arguments and the basis here ignore the mandatory requirements of the Land Act post-1988. The Trademark Law Revision Act was intended to require use in the ordinary course of commerce. Everything about their briefs and everything about this argument ignores the fact that there are no trademark rights unless it is in the ordinary use of commerce. Well, how does it work that it got registered so it gets this incontestable status, and then you have these pretty specific rules on how to lose that? I'm not sure I'm totally understanding how that would have happened here and why they didn't notice the impact of that. Sure. I think, Your Honor, Judge Paul mentioned in the traffics case that sometimes the Patent and Trademark Office makes a mistake every now and again. And as a matter of fact, Your Honor, the Patent and Trademark Office states that no particular decision of any trademark examiner is binding upon them going forward. But to your point about— But, I mean, in this case— Yes. Did they do it right? I mean, did they do it and then get the three-year rule? They didn't do it right in this respect, Your Honor. They never sold software. You have to make use. If you do not make use of software when you are filing— and their testimony is uncontroverted. We don't sell software. It was devised as an internal software program to run our airlines. Only the employees of NETJS on a need-to-know basis get logins and credentials. This sits on their internal network. This isn't something anybody else can get to. It's got all the information about the Arnold Schwarzeneggers in the world, all of the confidential information so they don't get it. But back to your question in the Trademark Office. It's interesting that you asked that because the Supreme Court has looked at what incontestability means twice in the last 30 years. Justice O'Connor talked about it in the Park and Fly case. And, again, Justice Souter talked about it in the KP Permanent Banking case. And, of course, Justice O'Connor said we look at the statute and we take it that it means what it says. So in both of those cases, while they didn't have anything to do with lack of use, in the KP Makeup case, the court basically stated that incontestability in Section 33B has a precondition. And it states that the right of the registrar to use such registered mark in commerce for the goods or services with which such mark has been in continuous use for five consecutive years subsequent to the date of such use and registration and is still in use shall be incontestable. That's the statute. Now, what does that mean? It means that if a paralegal prepares a document and files it in the Trademark Office, they have no reason to doubt it. But, again, if you look at even the Trademark Office rules, the Trademark Manual of Examining Procedure says when a declarant who owns a trademark files in Section 815 of a date of claiming incontestability, it simply becomes a public record that they have filed it. It is not a determination by the Patent and Trademark Office that the registration is, in fact, incontestable. The question of whether a registration is incontestable arises and is determined by a court of law if they're associated. You know so much more about this than I do. Just help me make sure I've got my bearings here. I was thinking the way this case came to us is that below it had the incontestability status. And so as in Park and Fly, you've got to follow one of the options for getting rid of it. In this case, it's the abandonment theory. Am I right? That's the way to think about this case? Yes. You are right that that's what Judge Frost said. He could have also decided that this was a basis of void of the NISBO as well. Right. Okay. Well, usually we let district courts look at that stuff in the first instance. I understand that, but it doesn't matter. We can get you to the same place, Your Honor. Well, let's assume he's right about – I mean, it's not a bad assumption. Let's assume he's right about the framing that's incontestable. Let's assume the only way to deal with this from your side is abandonment. Correct. Talk to me about that, and I'm just trying to make sure there's not a disputed fact about this. There's absolutely no disputed fact about this, Your Honor, because the disputed fact – obviously this court, Judge Strange and Judge Block, I know they were there a couple years ago in the Yellow Book case. They found that non-use for six consecutive years certainly met the three-year requirement in this case. And, of course, they cited the famous quote that comes from the Supreme Court in the Rectanus United drug case, which basically says that, you know, if there is no goods – you know, a trade – there's no such property right to trademark except as a right appurtenant to establish a business trade. If abandonment on its face seems kind of odd to me, they're clearly – whatever they were using, they've been continuing to use it. Is the whole problem that they went in as a trademark rather than a service mark, or are you saying that they – that no matter how important this is to their business, everybody else can keep – can start up using the same thing? You can have a – you know, you can have a restaurant in an airport and call it IntelliJets? What I'm saying, Your Honor, is that NetJets is in the business, as I think you noted, of basically running a fractional airline. And that's what Lens.com looked at. And that's what about 50 years of cases in the trademark office and in the Federal Circuit looked at. And unless they decided they were going to get in the software business and decided to get there – but their witnesses testified uniformly. We do not allow anyone to see our source code. We will not ever do it. They talked about – Mr. Dunning talked about how it was developed. It was developed internally, replaced the prior one. He would not even talk to his competitors about it because it was proprietary. Their in-house counsel testified. This is a trade secret. Your opposing counsel says that in this arena of software and the market for it, because clearly the cases do look at what kind of market is for a product. And some markets you have to sell every day, and some markets you may only sell once or twice a year, big products. Absolutely. So their argument is that Marquis and I think NAS were the other sales or licenses. They would sell or license outside – export, sell, or license outside the United States. Why are they wrong that that, in this particular situation, would constitute use in commerce? They're wrong because they didn't do it, and they registered this in 1995, saying they had been using it. And as the end of this case, they had never used it. And they're wrong because their own witnesses testified. It was a trade secret. It was proprietary. All this talk about general etiquette and that. Their testimony, in other words, that we would never let anyone have this software. It was registered for software for managing aircraft leasing and sales. Mr. Dunning testified, Honeywell's in the business. They do flight management software. They sell flight management software. There are lots of companies out there that are in that business. This is nothing more than an internal software system that is used by NetJets. It's not – The source code has nothing to do with it, is my point. No, the source code doesn't. It's the fact that it's software. It's software – And help me understand why, if they say, I'm not going to give anything to my competitors in America, but I'm willing to license this product outside of America and ship it, allow the usage of that outside of America in ways I don't hear. I mean, isn't the issue, what for this kind of software qualifies as using commerce? Maybe we better start with that. Am I wrong? Well, I won't say your honor is wrong. I will say your honor – I will say your honor is – No, I will say your honor that exactly what happened was they allowed their subsidiary companies, which is not used in commerce in the ordinary course of trade, to use it. But, again, the testimony was the software always lives in Columbus. All of the people who had access to it were in Columbus. All of the people overseas were affiliated with this. The testimony – Not when they first sold them, and they weren't affiliated. They didn't sell them. So you say a license doesn't qualify as use in commerce? If you license a third party, it's a seller transport. Seller transport. Right. Right. And you consider the sale of this licensing, you say, is not the sale of the good? The sale – you can have a license that is sale of good. What Mr. Stanley is neglecting is the fact that in 1988, the term use in commerce was added. Before that, all you had to do to say I have a trademark was say it was sold or transported. I use a trademark and it was sold or transported. In 1988, use in commerce is bona fide use of the mark in the ordinary course of trade, not merely to preserve rights and a mark. They have never allowed anyone outside of their own corporate family to use this software. Does that mean you're saying that the marquee, which they did acquire later, was not independent in 01 and that this Saudi – whatever his name was, Near Eastern, whatever – was not separate? I'll tell you, Your Honor, from the testimony of Mr. Dynance and the record, who is their IT architecture person, and Mr. Nettle, the in-house lawyer, because Columbia Insurance is a Berkshire Gatling company that owns the title and the trademarks and software. Mr. Dunn – we've deposed Mr. Dunn, and we asked repeatedly, is there a license? Did you have one? We finally wound up sending a request for admission, and the admission was we cannot find such a license. But that's sort of an evidence here. Correct. You've made a deal. It's astonishing. Insurance companies, we find they have multimillion dollars. That's right. When we asked Mr. Dunn, did the marquee actually give access to your computer system, he didn't know. So one thing I'm not following is why the affiliate thing makes a difference. I mean it seems like it's really emphasized in this very setting. I mean if you – if this doesn't count every time NetJets does it with a Berkshire Hathaway affiliate, you're talking about 10 percent of the GDP of this country. I mean, right? I mean that's – so how is – I don't understand why the affiliate thing has anything to do with it. It doesn't. It doesn't. They're not in the software business. That's the point. If they were in the software business – But this takes you back to Judge Bond's question, which, again, I don't know you're wrong. I just don't understand what's going on. It doesn't seem like the way they registered this, they get their presumption. They still seem to be using it in the same way. So how could that possibly be abandoned? It might be something else, but I don't understand how it can be abandoned. Here's why it's abandoned. Abandoned means did they ever use it? Did they ever use it in commerce in the ordinary course of trade like a software company? If they didn't use it in the ordinary course of software like a software company, then the first day that they didn't do that is when the clock on the measurement starts. It's not that they didn't use it. He makes a very good case. They're using it. You're saying it now. Okay, let me ask you a very practical question. It's a wonderful academic exercise. You're both wonderful trademark lawyers. Did you make any effort to settle this? Did our conference attorneys get involved? Because if you've really got 500 planes and you're really a mom-and-pop broker in Florida or wherever, this is fascinating, but did you guys try to settle this or would you like to try to settle this? Your Honor, we did. And I will say Ms. True and I are doing this out of the goodness of our hearts as opposed to anything else. I was wondering about that. I would say it's wonderfully academic. It might get valuable to get the thing resolved. I guess the other concern that I have is that it seems to me that there are two arrows, so to speak, in their quiver, that they developed this software, that they registered it as a good, and that they used it in the same way. But the second arrow is that it was a part of their services. It was. And I know we've got a pleading. If I fail to plead and it is your answer, tell me that. But let's assume first that they did plead that this is used in association with a service and that they have continually, because there's no question, they've continually used it in association with that service. Why doesn't that, under Section 43A, create the same danger of confusion of the public that you would? I mean, that's the overarching concern of the Lanham Act. So why doesn't it create the same concern that someone will go on the Internet, they will be looking for NetJets and looking for them by the software that they advertise, and instead they get your client who offers a comparable service and uses software with what is, quite frankly, a denigrating name? Tell me how that does not create problems. Your Honor, let me back up. Denigrating name was something that our witness, our own person, said that someone internally used for their own sales contact. They used it. He also called his boat the Intel boat. It was a joke that they started using long before this piece of litigation began. It wasn't to denigrate these people. He started using it in 2007.  No. The question is not intentionality. NetJet gets online and gets to your client who is, if we can be perfectly crass, saying, my software is IntelliJet, and that's what comes across, and they're thinking I'm with NetJets, and they're not. Isn't that somewhat what the Lanham Act is looking for? They don't want to have their product disparaged because someone else is using the name? Absolutely. It's to avoid confusion. But let me go back to a couple of things that are in the record, Your Honor, and make that case, forgetting the fact that they didn't lead it. The fact is that all of their witnesses testified what is IntelliJet, and every single one of them said it is our internal software program that runs our airline. It is the heart and soul of running our airline. Our employees cannot do their job without the software. That is what it was. It is only later on that is a throw-in. They said, oh, if it's not a trademark, then it must be a service. A service is what? There's been an intention here, and I certainly don't want the court to come away with a misapprehension, of conflating the fact that NetJets is a well-known fractional airline for wealthy people with the fact that they have an internal software system that they decided to call IntelliJet 20 years ago. They could have called it anything, but every company has software. Just one last question. It would be great if we could just get a point-by-point answer. My question is if you have an unusual privilege to write the district court decision for yourself, how you would have done it? Just two or three analytical points. Would you have not gone down the abandonment route? What would have been your – if you could only pick one route, no alternatives, what you think is the superior way of thinking about this case? I don't want a long conversation. I want just three points. Point one is X, point two is Y. If I was the district court, which I will not be so presumptuous, but if I did, the point would have been when I look at the definition of a trademark, no way in the neck. You would have said – you would have gone right after it doesn't have any contestable status. I would have said that, but I would have said before that it doesn't meet the definition. It's just never eligible, your whole point. IntelliJet does. If you read the – Just real quickly on that. So if you have the norms that give you incontestable status, you register, they do it, whether it's paralegal or a person right out of college, they raise it to you. Yes. Well, that's not easy, right? Is it really easy to just come back in and say, well, guys, I don't know what you were thinking, but there's no way this is eligible. Well, it's interesting because the Fourth Circuit had a decision like that in 1990, the Breitner case, and they looked at it. Name of the case? I think it's Breitner. I can get it for you. Breitner? Yes. I can look it up if I can understand the name. If you can understand, I'll – let me get it for you. They just went to that, and the way they approached it was to say, there's a presumption and a trademark, a presumption. It doesn't become incontestable unless it's been used. We're going to take the position – it was an abandonment claim, and we're going to take the position that since you didn't comply with the requirements of use for five years, we're just going to say – You wouldn't have focused on that it was registered for good and it should have been service. You wouldn't have focused on that. You would have really taken it right back to use today. I would have taken it right back. Okay. I know your function is a trademark. I know the use of it. If you want, I will – Use is in the software as a good. Use with software or for anything. Again, they failed to – this is internal software, and all they have used it for a bit is a marketing tool like they do to say we have really great food. They're not in the restaurant business, so they could call a restaurant as well on these fancy planes. It's just a marketing tool. It's not a service. It's not a separate service. It's what they're doing. I think we're finished unless my colleagues have any further questions. Thank you. Thank you, Your Honor. Brittany Gamby Jenkins is the name of the case. Your Honor, just two closing points. Our opponent would have all software be sold in Best Buy stores in a package you can walk out and pay your money and have your item in your hands. That's not software today. Use today and for the last several years has been far beyond Best Buy and a hard drive or something you can take out in your hands. We firmly believe this is a good that was used in Congress. My second and final point. Are you abandoning that it's a service? No, and that is my second point, Your Honor. Did you late it? Yes, and as a matter of fact, Your Honor, I couldn't quite understand that issue in this case because common law is mentioned at least six times in our complaint. Those words, common law, are mentioned at least six times in our complaint, the original complaint. In the follow-up reply to their counterclaim, we specifically refer to common law infringement. I don't understand that, but a service mark is also evident here. This is a service in the sense that we provide a service of flight aviation, private jet aviation to our customers. It's also a service. They know the software is being used behind the scenes for their benefit. This isn't that the code is behind the scenes. The code is private, but the use is very public. The consumer knows that they're getting the benefit of that software, and they know it by name, and we believe that's use of good. We also believe it was used as a service for the last 20 years. From the perspective of settlement, it's not my job to tell you how to think about it, but I can just offer two thoughts. Sometimes in settlements, we're thinking about the risk of precedent you're creating in court of appeals, and this use by proxy thing, I'm just not getting. But I'm only one person, but it just strikes me as really hard for me to understand where it comes from. So once you decide to let us decide, you've got precedent, first point. The only theory, again I'm speaking as one judge, the only theory that makes any sense for you to get anywhere here is that the abandonment approach of Judge Frost implicates some fact questions. So that's just more discovery, more time, more uncertainty. So it's not my job to tell you what to do, but I'm comfortable telling you how I see those two things. I appreciate that, Your Honor. And use by proxy, again I have to stress, is only one half of one argument. We also have the second argument, which is if this court finds that there was no use of a trademark on a good, this court can also go down the service mark path under common law and say that IntelliJet was used as a service mark with respect to flight. But under common law, you get no benefit in incontestability. That is true. We do not. And on incontestability, Your Honor, I appreciate your point there as well. I don't believe there was abandonment here. That was what was presented. That's how the judge ruled. I believe that was incorrect. Thank you, counsel. I think Judge Sutton said he's only one judge. I'm a different judge. But I will say that you both made such terrific arguments that I doubt that we're going to issue an opinion next Monday morning. So I think you do have some time to consider your options, and you do have a very excellent conference attorney in this office. That makes three of us who are suggesting that that might be a good solution for a small organization and a very large one that brought this thought. It might be a good time to figure out how those two organizations can come together. That case will be submitted, and the remaining cases will be submitted on the briefs in the third quarter.